Charlie's Cafe Exceptionale, Inc. v. Commissioner.
Charlie's Cafe Exceptionale, Inc. v. Commissioner
Docket No. 7465.
United States Tax Court
1947 Tax Ct. Memo LEXIS 339; 6 T.C.M. (CCH) 32; T.C.M. (RIA) 47004; January 14, 1947
P. L. Farnand, Esq., for the petitioner. Lester M. Ponder, Esq., for the respondent. DISNEY
Memorandum *340 Findings of Fact and Opinion DISNEY, Judge: This proceeding involves deficiencies in income, declared value excess profits and excess profits taxes in the respective amounts of $2,736.20, $1,057.19 and $3,064.29 for the fiscal year ended September 30, 1941. The issues are whether the respondent erred in disallowing $15,299.06 for rent and $700.02 for traveling and advertising expenses. Findings of Fact The petitioner, a Minnesota corporation, was organized October 13, 1938, in the name of Charlie's Cafe Exceptionale, Inc., with a capital stock consisting of 250 shares of a par value of $100 each, to operate, in general, a restaurant and cocktail bar. It filed its income tax returns for the taxable year with the collector for the district of Minnesota. It kept its books and prepared its returns on the accrual basis. The return for the taxable year was signed by Marguerite Pfeifer, as president. In December 1933, Charles W. Saunders and Charles Herlin formed a partnership to operate, and thereafter operated, a restaurant and cocktail bar in the name of Charlie's Cafe Exceptionale in premises located at 716 Fourth Avenue, South, Minneapolis, Minneaoolis Herlin died about one year *341 later and thereafter Saunders purchased Herlin's former interest from his estate and operated the business as sole owner. Prior to 1936 the liquor license for the business was issued first in the name of the partnership and after the death of Herlin, in the name of Saunders. In January 1936, when Saunders filed an application for a new liquor license, there was some question about his right to have a license because of a conviction for a misdemeanor, and as a consequence, he consulted counsel. The application was denied by the city council on February 7, 1936. Prior thereto, to wit, on January 30, 1936, Saunders transferred the assets of the business to Irene Herlin for an alleged consideration of $20,000, of which $500 was paid, and the remainder of $19,500 was covered by a mortgage on the assets of the business. No payments were made on the mortgage. On February 3, 1936, Irene Herlin, allegedly doing business as Charlie's Cafe Exceptionale, applied for, and thereafter received, a liquor license for the business. She also received the liquor license for the years 1937 and 1938. Petitioner was issued a license for the year 1939. On February 18, 1936, Saunders was indicted for perjury *342 by the grand jury of Hennepin County, Minnesota, because of a statement made by him in an application filed on January 21, 1935, for a liquor license, that he had never been convicted of a crime. Saunders pleaded guilty and was fined $500. Irene Herlin became ill in 1938 and was advised that she could not be cured of her ailment. Thereafter until 1943, when she died, she was confined to her bed most of the time. The sickness of Irene Herlin caused Saunders to consult an attorney about incorporating the business, and subsequently the petitioner was incorporated by Ralph Edwards, Marguerite Pfeifer and her husband, Fred B. Pfeifer. At a meeting of petitioner's board of directors on October 19, 1938, the directors, being the incorporators, were authorized to accept cash or negotiable instruments in payment of the subscriptions of Marguerite Pfeifer for 30 shares and her husband and Ralph Edwards for one share each and to issue capital stock to the subscribers in such amounts. The minutes of the meeting recite that there was presented to the directors a bill of sale executed by Marguerite Pfeifer showing that she was the owner of the assets of the business known as Charlie's Cafe Exceptionale, *343 subject to certain encumbrances in the nature of conditional sales contracts, and that the instrument recited a consideration of $10,500, but until the amount was verified by an audit, the amount of corporate stock issued in payment for the business should remain at 32 shares. They also recite that the corporation agreed to accept the bill of sale, pay the amounts due on the conditional sales contracts referred to in the instrument and that a copy of the bill of sale was ordered to be attached to the minutes. Marguerite Pfeifer was elected president of petitioner at the meeting. Marguerite Pfeifer is a half-sister of Saunders. She was not employed by petitioner in any capacity, or engaged in the restaurant business prior to 1938, and does not actually perform any regular duties for petitioner in connection with the operation of its business. Marguerite Pfeifer had no income during the years 1938 to 1941, inclusive, other than what she received from petitioner. Saunders has always been good to her and occasionally made small gifts to her. The records of the collector for the district of Minnesota do not disclose the filing of income tax returns by Fred Pfeifer or Marguerite Pfeifer *344 for any of the years 1933 to 1939, inclusive. On November 3, 1938, Irene Herlin executed a bill of sale, wherein for a recited consideration of $10,500, she allegedly transferred the assets of the business known as Charlie's Cafe Exceptionale to Marguerite Pfeifer. The mortgage outstanding in favor of Saunders for $19,500 was assumed by the transferee. On the same day, Marguerite Pfeifer executed a like instrument allegedly transferring the assets to petitioner upon the same recited terms. In connection with the purported transfer to her, Marguerite Pfeifer gave Saunders a mortgage note for $19,500, on which nothing has been paid. The minutes of a meeting of the board of directors of petitioner held on December 20, 1939, recite that an audit of the books of the corporation disclosed that its assets were $10,500 in excess of liabilities and directed the proper officers to issue additional stock to Marguerite Pfeifer for the difference between the amount and the $3,200 par value of stock originally issued. They also recite that the mortgage in the amount of $19,500 was in default; that the mortgage adversely affected the financial statement of the business, and that the president *345 of petitioner, Marguerite Pfeifer, announced at the meeting that she had arranged with Saunders, the holder of the mortgage, to satisfy the mortgage upon the giving to him of her personal obligation to pay the amount thereof. The capital stock account of petitioner contains the following entries, all credits, to the close of 1938: November 15, 1938
$10,500
December 31, 1938
200
December 31, 1938
500
December 31, 1938
2,000
In 1940, Marguerite Pfeifer was issued 83 shares of stock for accrued salary, in accordance with a resolution adopted by petitioner's directors on January 10, 1940, and the capital stock account was credited on December 31, 1940, with the amount of $8,300. At the same meeting Marguerite Pfeifer was voted a salary of $2,400 for the fiscal year 1940 of petitioner. The record of stock certificates issued by petitioner shows that as of September 30, 1941, Marguerite Pfeifer held 213 shares of its stock and Fred B. Pfeifer and Bernice Goodman one share each. Saunders has been general manager of petitioner since it was incorporated. Other than a farm, he has no other business connections. He devotes from 10 to 12 or more hours a day to the *346 affairs of petitioner and makes all of the major decisions for the operation of the business. His duties were approximately the same while Irene Herlin held title to the assets of the business in her name. He operated the business as he considered it should be run. He never filed a gift tax return. His salary for the year ended September 30, 1940, was $9,000. At a meeting held on February 10, 1941, the directors of petitioner increased his salary to $10,000 for the taxable year. The minutes of the meeting recite that before the directors voted the increase in salary, Saunders stated to them at the meeting that "it was apparent that the success of the business of the corporation was due to his efforts * * *." Prior to 1938 the partnership and Saunders had leases from the mother of Robert Steele for the premises at 716 Fourth Avenue, South. The rental paid started at $150 a month and thereafter was increased, first to $175 a month and then to $200 a month. In or prior to April 1938 there was a disagreement between Saunders and Robert Steele, the then owner, concerning the amount of rent for the premises under a renewal lease. Each selected a real estate man to consider the matter *347 and Steele agreed to accept the rental fixed by them with the assistance of a third man. The three men, each of whom was a competent real estate man, agreed upon a rental of $300 a month, and the amount so determined was accepted by Saunders. The new lease was entered into on April 28, 1938, by Saunders and Robert E. Steele and his wife for a term of five years from October 1, 1938, at a rental of $18,000 payable monthly in advance in installments of $300, with an option to extend the term of the lease for an additional period of five years upon the same rental and terms, provided written notice thereof was given the lessors six months prior to the expiration of the lease. The premises were leased to Saunders for restaurant purposes and the sale of liquor in connection therewith. The lessee was given the right to assign or sublet the lease subject to a right in the lessors to show that the assignee or sublessee was an unfit or unsuitable person and a continuation of the lessee's liability for rent, unless released in writing by the lessors. Leases, providing for rent on the basis of a percentage of gross sales, were in general use in Minneapolis in 1938. Saunders did not assign *348 the lease to petitioner but permitted it to occupy the premises on a month to month basis under his lease, with the understanding that petitioner would pay directly to the lessors the rental provided for in the lease. The income tax returns of petitioner for the fiscal years ended September 30 in 1939 and 1940, contained deductions of $3,000 and $3,600, respectively, as rent for the premises. In 1940, Saunders concluded that petitioner should pay him a higher rental for the premises based upon a percentage of its gross income. He took the matter up with a member of a firm of accountants who had been retained to serve as auditor for petitioner and requested him to consider the question and give his advice on a fair arrangement. The auditor and Saunders had a thorough discussion of the subject. After consulting a recognized real estate man, the auditor recommended that a rental equal to 10 per centum of gross income be charged. Reduction in income tax liability was taken into account by the auditor in his consideration of the matter, and since then he has advised other clients to enter into similar leases. Saunders concluded that a fair and reasonable rental would be 7 per centum of *349 petitioner's gross income. The auditor of petitioner holds himself out to the public as an expert on tax matters. At a special meeting held on February 10, 1941, at the request of Saunders, the directors of petitioner approved a draft of lease with Saunders for the premises the corporation was occupying. The form of lease approved by the directors was executed by the petitioner and Saunders the same day and provided for occupancy of the premises in their then condition for a term commencing January 1, 1941, and terminating September 29, 1943, at a rental equal to 7 per centum of the gross receipts of petitioner, computed in a manner specified in the instrument and payable on certain dates on the basis of gross receipts to a prior date. Rent for the first nine months of the term of the lease was due on September 30, 1941. The lease was not assignable without the written consent of the lessor. The lessor agreed to return to the petitioner out of rent paid an amount sufficient to make up any deficit of net income under 10 per centum of the par value of outstanding capital stock, without, however, regarding state and federal income taxes as an expense. The lessee was given the right *350 to terminate the lease in the event it was unable to obtain licenses necessary to transact business. The gross sales of petitioner for the fiscal years ended September 30, in 1939, 1940, 1941 and 1942 were, $192,434, $220,629.13, $305,354.86 and $503,774.53, respectively. The petitioner did not pay any dividends during its fiscal years ended September 30, 1939, 1940 and 1941. The matter of dividend payments was generally discussed at directors' meetings. The conclusion was reached on each occasion that the earnings should not be distributed. The rent account of petitioner contains a charge of $300 on January 10, 1941, and February 10, 1941, and a like debit each month thereafter to the close of the taxable year. The accrued rent account of Saunders on the books of petitioner contains a credit entry made in October 1941 as of September 30, 1941, of $17,731.75, for rent payable for the period from January 1, 1941, to that date, and had a balance of $13,531.75 payable to Saunders at the close of September 30, 1941, and $12,631.75 at the close of December 15, 1941. The account of Saunders on the books of petitioner had a balance, payable to him, of $5,931.50 and $2,778.82 at the *351 close of September 30, 1940, and September 30, 1941, respectively, and $700.02 on December 31, 1941. The account included accruals for expenses payable to Saunders for traveling and advertising expenses paid by him, and salary. The balance sheets of petitioner at the beginning and close of the taxable year, as reported by it in its return for the taxable year, were as follows: ASSETS:
Beginning
Close
Cash
$ 1,466.57
$ 1,978.63
Notes and accts. rec.
4,304.87
6,178.91
Inventories
11,156.47
46,427.76
Furniture & fixtures
35,548.36
38,699.86
Other assets
2,176.92
4,059.41
Total Assets
$54,653.19
$97,344.57
LIABILITIES:
Accounts payable
$24,756.15
$52,684.08
Bonds, notes and mort-
gages payable
6,421.95
1,000.00
Accrued expenses
9,240.52
10,037.57
Capital stock
13,200.00
21,500.00
Surplus
1,034.57
12,122.92
Total Liabilities
$54,653.19
$97,344.57
There was no agreement between petitioner and Saunders about the time and manner he could withdraw amounts accrued by the former in favor of the latter for salary and traveling and advertising expenses. The petitioner could have made a bank loan at the close of the *352 taxable year to obtain sufficient funds to pay the amounts payable to Saunders, according to its books, in the event Saunders had requested payment. Saunders did not need the money payable to him for rent and the funds were needed by petitioner to increase its inventory of liquor. Saunders had authority on September 30, 1941, to sign checks for petitioner. The income tax return of Saunders for the calendar year 1941 was filed on the cash basis. The income reported by him included the amount of $17,731.75 for rent accrued by petitioner. The income tax return filed by Saunders for 1941 reported as income, salary of $10,000, less $1,754.30 for expenses deductible therefrom, interest of $1,651.93 and rent and royalties of $22,149.13, and total income of $32,046.76. The return did not include the item of $700.02 for traveling and advertising expense from petitioner here in issue. In its return for the taxable year, the petitioner claimed as deductions, the amount of $18,899.06 as rent, and $2,778.82 for traveling and advertising expense. The amount for rent includes the $17,731.75 credited to the rent account of Saunders. In his determination of the deficiency the respondent disallowed *353 $15,299.06 of the deduction for rent upon the ground that the amount constituted a distribution of profits. He also held, in the alternative, that no amount in excess of $6,267.31 was deductible for rent under section 23 (a) as modified by section 24 (c) of the Internal Revenue Code. The respondent allowed, under the same provisions of the statute, $2,078.80 of the traveling and advertising expense, and disallowed the remainder of $700.02. Both in 1938 and 1941 some restaurants in Minneapolis, serving liquor, were paying rent on a basis of approximately seven per cent of gross sales. Opinion Of the amount of $18,899.06 claimed by the petitioner as a deduction for rent, $17,731.75 of which was accrued by petitioner as rent under its lease with Saunders, the respondent allowed $3,600, an amount equal to the rent payable by Saunders under his lease with the property owner, and disallowed the remainder as a distribution of profits. The issue relates to the rent payable to Saunders under the terms of his lease with petitioner, the amount thereof, $17,731.75, not being in controversy. The contention of petitioner is, in effect that the amount of $17,731.75 constitutes *354 a fair and reasonable rental for the occupancy of the premises and regardless of the ownership of stock of petitioner, is deductible as rent under the provisions of section 23 (a) (1) of the Internal Revenue Code, which allows deduction of "rentals or other payments required to be made as a condition to the continued use or possession, for the purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity." The respondent's argument, in general, is that Saunders was the true owner of petitioner's stock and that the plan was devised and carried out to distribute profits to Saunders in the guise of rent. It is well settled that substance controls over form in determining income tax liability. Griffiths v. Helvering, 308 U.S. 355; Higgins v. Smith, 308 U.S. 473; Commissioner v. Court Holding Co., 324 U.S. 331. The rule applies to ownership of stock. Ralph R. Anderson, 5 T.C. 443; Carlton B. Overton, 6 T.C. 304. It is evident that the objective of the transfers was to take the ownership of the assets of the business out of Saunders *355 and place record ownership in others in order to obtain licenses to sell liquor as part of the activities of the business. Early in 1936, when it appeared that his application for a liquor license would be denied, Saunders consulted counsel, and promptly thereafter transferred the assets of the business to Irene Herlin. Record ownership of the business in her name enabled her to obtain licenses for 1936, 1937 and 1938 caused Saunders to again consult counsel, this time about incorporating the business. The formation of petitioner followed and its stock, instead of being issued to Irene Herlin, was issued to Marguerite Pfeifer, a half-sister of Saunders, as a transferee of the assets from Irene Herlin. The lack of reality of the plan is apparent. The evidence does not disclose the source of the $500 payment made to Saunders on the alleged selling price of the assets to Irene Herlin. Neither did petitioner prove the payment of any amount by Marguerite Pfeifer to Irene Herlin. When it appeared advisable to organize petitioner, it was Saunders and not Irene Herlin, the purported owner of the assets to be acquired, who sought legal advice on the matter. The course taken is contrary *356 to the procedure that would have followed if Irene Herlin had been the real owner of the assets. There is no proof that Irene Herlin received any consideration for the assets transferred other than the assumption by the transferee of the mortgage the transferor had given Saunders, nor any explanation for the willingness of Irene Herlin to pass title to property without greater consideration. It shows that she was never intended to be more than a mere record owner of the assets for Saunders. Neither is there any evidence of bargaining of any kind to make the transfer. The evidence discloses no greater reality with respect to the stock holdings of Marguerite Pfeifer in petitioner. She and her husband and another individual were named as organizers of petitioner. Irene Herlin then had an incurable ailment, and it is apparent that the condition of her health induced Saunders to select his half-sister to become the record stockholder owner of the new corporation. She had no experience in the restaurant business prior thereto and, as a record stockholder and president of petitioner, performed no regular duties for petitioner. Other than an issue of 83 shares of stock for accrued salary *357 at a time when she already held, in her name, all except two qualifying shares of the corporation's outstanding stock, there is no evidence of payment of any salary to her by petitioner for services rendered. Petitioner did not pay a dividend up to the close of the taxable year, and the evidence does not disclose whether one was paid after that date. Neither did Marguerite Pfeifer ever pay anything on the note she gave Saunders in the amount of $19,500. In December, 1939, she arranged with Saunders to satisfy the note by giving him her personal obligation to pay. The willingness of Saunders to give up collateral for payment of a note in exchange for an unsecured promise of the maker to pay the debt, indicates lack of reality of the transaction in the first instance, particularly because the maker had no source of income other than as an officer of petitioner. The minutes of the meeting of the directors of petitioner on October 19, 1938, recite that there was presented at the meeting a bill of sale executed by Marguerite Pfeifer, "whereby it appears that she was the owner of the assets of the business known as Charlie's Cafe Exceptionale, * * *". The facts here establish that the *358 bill of sale from Irene Herlin to Marguerite Pfeifer and from the latter to petitioner were not executed until November 3, 1938. The same minutes recite that no stock in excess of 32 shares should be issued for the assets specified in the bill of sale until verification of the recited consideration of $10,500 in the instrument. The minutes of the directors' meeting on December 20, 1939, recite that an audit disclosed assets of $10,500 in excess of liabilities and directed the issuance to Marguerite Pfeifer of stock for the difference between the amount and the $3,200 par value of stock originally issued. The books of petitioner disclose the issuance of 105 shares on November 15, 1938, and 27 shares on December 31, 1938. The record does not show to whom the stock was issued. The only stock issued thereafter was 83 shares and they were issued in 1940 to Marguerite Pfeifer for accrued salary. It seems apparent that 128 shares of the stock were outstanding in the name of Marguerite Pfeifer at the close of 1938, since 83 other shares were issued to her in 1940 and 213 shares were in her name on September 30, 1941. In any event, petitioner has failed to show that at all times prior to the *359 close of the taxable year all of its stock, except two shares, was not outstanding in her name. These conflicts in the record constitute cogent evidence of the lack of reality of the transactions involving the acquisition of assets by petitioner and the issuance of its stock. From all the evidence, we find that Saunders was the actual owner of the outstanding stock of petitioner. The petitioner had the burden of proving that the amount disallowed by the respondent constituted rent as claimed in the return, and not a distribution of profits, as determined by the respondent. The statute limits deductions for rent to amounts "required to be made as a condition to the continued use or possession, * * * of property * * *." The fact that a form of lease was entered into, under the terms of which petitioner became obligated to pay amounts as rent, will not satisfy petitioner's burden. Deputy v. Du Pont, 308 U.S. 488; Interstate Transit Lines v. Commissioner, 319 U.S. 590; The Atlantic Monthly Co., 5 T.C. 1025. The circumstances require us to consider all of the evidence and determine whether the substance of the transaction is consistent with its *360 form. The situation here is unusual. Saunders, the real owner of petitioner's stock and who controlled its activities, was the lessee of the property being occupied by the petitioner under a lease at a rental of $3,600 until September 30, 1943, with an option to renew on the same terms for a period of five years. Petitioner had been occupying the premises on a month to month basis under an oral arrangement entered into with Saunders at the time of its organization. Saunders concluded that petitioner should pay him for the use of the property an amount in excess of the rental payable by him as lessee and after consulting petitioner's auditor and receiving his advice, given after consulting a real estate man and considering income tax savings, decided to execute a lease providing for rental on the basis of a percentage of gross receipts. The procedure taken to put the plan into effect was simple. The directors of petitioner, they being its stockholders of record, held a special meeting on February 10, 1941, at the request of Saunders and approved the execution of the lease submitted to them by Saunders at the meetings. The evidence discloses no notice of any kind by Saunders to petitioner *361 of the termination of the oral leasing arrangement he had entered into with it or that he would serve notice if the new lease to be submitted was not entered into. Accordingly, we must assume that petitioner was not threatened with eviction from the premises. There was no bargaining for a rental, fair or otherwise. Obviously, with Saunders occupying the position he had with respect to control of petitioner, none was intended, or necessary. However, petitioner points to a recitation in the minutes of the meeting of the directors to the effect that a director questioned a lease on a straight percentage basis on the ground that it might result in serious loss to the corporation and that Saunders met the objection by agreeing to provide in the lease for a refund of rent sufficient, if necessary, to show corporate profits of 10 per cent of the par value of outstanding stock. Other portions of the minutes recite that a lease, in the form attached to the minutes, was approved for execution. Thus the lease submitted at the meeting was signed without alterations and contained a provision for refunding rent paid to make good loss of profits. Notwithstanding lack of proof of a notice to quit, *362 the lease was made retroactive to January 1, 1941, and was thus made to cover a period during which petitioner occupied the premises under an oral agreement at considerably less rental. The provision is evidence of the dominance of Saunders over the situation and lack of bargaining between the parties to the lease. The petitioner places great reliance upon testimony of qualified witnesses that the rent fixed by the new lease was fair and reasonable. Such testimony is not controlling. The facts with respect to the 1938 lease show disagreement between Steele and Saunders on the amount of rent to be paid under a renewal lease; that three qualified real estate men set a rental of $300 a month and that the interested parties accepted the amount. The qualified experts who testified to the fairness of the percentage rental set forth in the new lease with petitioner, also testified that the real estate men who agreed upon the amount in 1938 were competent and qualified. Percentage leases were in use in Minneapolis in 1938 and the evidence does not show that a lease on such terms was not considered by the board of real estate men and Saunders and the property owners in fixing the rental at *363 the rate of $300 a month. The rent was agreed upon in an arm's length transaction with the assistance of experts on the subject. No evidence was offered to show that the property increased in value after 1938 to such an extent as to justify a higher rental. The evidence on the question of a fair rental for the property during the taxable year is conflicting and we are not bound to accept the testimony of petitioner's witnesses alone on the point. Hughes & Hatcher, Inc., Memorandum Opinion, entered April 6, 1945 [4 TCM 369,], cited by the petitioner, is $ distinguishable. There the rental was a fixed minimum plus a percentage of sales, first, on sales in excess of $500,000, and, later during the taxable year, in excess of $750,000. The rental originally charged was less than the lessor was advised would be a reasonable amount and the increased rental in effect during part of the taxable years was the direct result of improvements made by the lessor. The rent for the remainder of the taxable years was fixed after negotiations in which the parties were represented by counsel and was reduced, rather than increased. The case of In re General Film Corp., 274 Fed. 903, *364 relied upon by the petitioner, is also distinguishable. There the rental charged was less than what the films seemed to have been worth and the extra charge had no reference to stock ownership. The petitioner's theory is that it need prove only that the $17,731.75 is a fair rental for the property; and reliance is placed on the testimony of certain realtors. The testimony of the realtors is to the effect that some restaurants, in Minneapolis, serving liquor, paid approximately 7 per cent of gross sales as rent. From this they expressed the opinion that a reasonable rental for petitioner to pay at 716 Fourth Avenue, South, Minneapolis, was at least 7 per cent of such sales. In our view, such evidence does not demonstrate error in the disallowance of the deduction above $3,600 for rent for the taxable year. Though the statute does not in terms limit deductions for rent to "a reasonable allowance" - Stanley Imerman, 7 T.C. 1030, (No. 121, promulgated October 23, 1946), it allows as deduction the amount "required" to be paid. We consider the evidence here insufficient to sustain the petitioner. No evidence before us indicates that premises equally as advantageous as those *365 occupied, in the same vicinity or elsewhere, could not have been rented without paying percentage rent, or that 716 Fourth Avenue could have been rented to anyone other than the petitioner under a 7 per cent lease, or that other property in the vicinity and equally fitted for petitioner's restaurant use, was rented on a 7 per cent basis. So far as the record indicates, property of the same size and character, in the same vicinity, may have been renting for $300 per month, as this property was rented to Saunders - covering the taxable years. The realtors relied on named only four restaurants in Minneapolis paying percentage rental, though there was indication of "some" others. Obviously, such rental is there the exception rather than the rule. All this, in our view, means that the opinion of the realtors that 7 per cent was a reasonable figure for a percentage lease does not call for a conclusion that the petitioner was required to pay $ that amount for rent. Other realtors, equally capable, had participated in the conclusion that $300 a month was reasonable in 1938 and for a period of 10 years. Saunders, petitioner's manager and in fact owner, and Steele, the owner of the property, *366 dealt on that figure. Taking all of this evidence together, we think the petitioner has failed to meet its burden. The figure $17,731.75, or 7 per cent of petitioner's earnings, appears as a capitalization, at that percentage, of the obvious business ability of the management of the petitioner, rather than the rental value of the property as such. Chicago Shipping & $ Storage Co., 15 B.T.A. 431, Limericks, Inc., 7 T.C. 1129 (No. 132, promulgated November 12, 1946). There is logical difficulty in finding rental property costing a rental of $300 per month, to be reasonably worth $17,731.75 for nine months. We hold that the Commissioner has not been shown to have erred in allowing deduction of only $3,600 for rent. Of the amount of $2,778.82 claimed by the petitioner as a deduction $ for traveling and advertising expenses, the respondent allowed $2,078.80 and disallowed $700.02, payable to Saunders, as nondeductible by the provisions of section 24 (c of the Internal Revenue Code. [1]Section 24 (c) (3) refers to and depends upon $ section 24 (b). Section 24 (b) provides, to the extent material here, that no deduction shall be allowed for a loss sustained in *367 sales of property except in the case of a distribution in liquidation, between an individual and a corporation, 50 or more per cent of whose stock is owned, directly or indirectly, by the individual; that an individual shall be considered as owning the stock owned by his family and that the family of the individual includes a half-sister. *368 The petitioner contends that the amount of $70002 in controversy was constructively received by Saunders within two and one-half months after the close of the taxable year and was included in his return for the taxable year; and that therefore petitioner may deduct that amount. The record and petitioner's brief make no definite distinction between amounts accrued in favor of Saunders for salary and for traveling and advertising expenses paid by him for petitioner. Entries for both classes of expenses were entered in an account in petitioner's books under the name of "Accrued Salaries - Charles Saunders." Other evidence refers to the account as a drawing account of Saunders and as "accrued Expense Payable - Chas. Saunders." In any event, the account, regardless of its correct name, had a balance of $2,778.82 in favor of Saunders at the close of the taxable year, and $700.02 on December 15, 1941, two and one-half months thereafter. The petitioner claimed the credit balance of $2,778.82 in the account as a deduction for traveling and advertising expenses and the issue raised by the pleadings is confined to the allowance of $700.02 for such expenses. Such treatment is contrary to *369 the idea that salary accrued in the account was unpaid at the close of the taxable year, and that any part of the amount in controversy relates to salary. Accordingly, discussion of the evidence will be confined to such as relates to traveling and advertising expenses. It is well settled that all of the conditions of section 24 (c) must coexist to prevent the deduction. Michael Flynn Manufacturing Co., 3 T.C. 932; Ohio Battery & Ignition Co., 5 T.C. 283; Anthony P. Miller, Inc., 7 T.C. 729. The third condition is met whether Saunders or Marguerite Pfeifer, his half-sister, is the actual owner of in excess of 50 per centum of petitioner's stock. The recent case of Anthony P. Miller, Inc., supra, holds that the word "paid" in the first condition "means paid in cash or its equivalent" and that the practical effect of the ruling is that the debtor is on a cash basis of accounting in regard to the deduction during the period of grace. There a demand note was not regarded as payment. Here, nothing was given for the balance due; it simply remained an account payable after the period of grace. Clearly there was no payment by petitioner *370 and subsection one applies. There remains the question of whether subsection two applies. Saunders testified that he included the amount in his income tax return and petitioner asked us to find as a fact that he reported the amount as income. The return of Saunders is in evidence and it discloses that he did not report the amount as income. We regard the return as the best evidence, under the circumstances, of the income Saunders reported. In any event the applicability of condition two depends upon whether the amount was includible in the income of Saunders, not whether it was included. Anthony P. Miller, Inc., supra. Most of the testimony having a bearing upon the question of constructive receipt was specifically directed to the alternative question of whether the unpaid balance of $6,267.31 in the rent account of Saunders on December 15, 1941, was deductible from income. Such testimony with respect to the lack of actual payment is to the effect that Saunders did not withdraw the amount because he did not need the money and the petitioner needed it to increase its inventory of liquor. Concerning the amount in question, the record establishes that Saunders was in *371 charge of the activities of petitioner and had power to sign checks drawn on its bank account; that petitioner had sufficient cash or bank credit to pay the debt and that there was no agreement between the debtor and creditor as to the time when or the manner in which the amount could be withdrawn. Thus, the evidence contains no proof that the amount was payable prior to or on December 15, 1941, and we may not assume that such is fact. Nor does the evidence show when the $2,778.82, which includes the $700.02 in question, was credited to Saunders on the books. The record shows only that $100 for traveling expense was credited to Saunders' account under date of December 31, 1940, and that $1,065 was credited to his account at the close of the taxable year for advertising. The failure of Saunders to include the amount in his return is strong evidence that he did not regard the amount as having been constructively received. The evidence as a whole discloses a purpose to leave the money with petitioner to build up a reserve of liquor. This points to a conclusion of Saunders, acting for himself and petitioner, that the amount would not be payable until after a sufficient inventory of liquor *372 had been established and nothing appears to show that that occurred on or prior to December 15, 1941. Hustad Co., 43 B.T.A. 446; Cox v. Commissioner, 128 Fed. (2d) 957. The theory of constructive receipt should not be applied except under unusual circumstances. Here it can not be soundly held that Saunders constructively received the amount in 1941 so as to make it includible in his income. Accordingly, it was not error for respondent to deny the deduction in issue. Decision will be entered for the respondent. Footnotes
1. SEC. 24. ITEMS NOT DEDUCTIBLE. * * * * *
(c) Unpaid Expenses and Interest. - In computing net income no deduction shall be allowed under section 23 (a), relating to expenses incurred, or under section 23 (b), relating to interest accrued - (1) If such expenses or interest are not $ paid within the taxable year or within two and one-half months after the close thereof, and (2) If, by reason of the method of accounting of the person to whom the payment is to be made, the amount thereof is not, unless paid, includible in the gross income of such person for the taxable year in which or with which the taxable year of the taxpayer ends; and (3) If, at the close of the taxable year of the taxpayer or at any time within two and one-half months thereafter, both the taxpayer and the person to whom the payment is to be made are persons between whom losses would be disallowed under section 24 (b)↩.